# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| MICHAEL M. SIROIS and<br>ALICIA M. SIROIS<br>    Plaintiffs,<br><br>v.<br><br>USAA CASUALTY INSURANCE COMPANY<br>    Defendant. | No. 3:16-cv-1172 (MPS) |

**RULING ON MOTION TO DISMISS**

Plaintiffs Michael L. Sirois and Alicia M. Sirois (collectively, "Plaintiffs") filed this action in state court against their homeowner's insurance provider, USAA Casualty Insurance Company ("USAA"), for failure to pay for damages to the basement walls of their home caused by cracking and deterioration in the concrete. USAA removed the case to this court on July 13, 2016. (ECF No. 1.) On October 21, 2016, the plaintiffs filed an amended complaint, bringing claims of breach of contract (Count One) and unfair and deceptive practices in violation of the Connecticut Unfair Insurance Practices Act, Conn. Gen. Stat. § 38a–816 *et seq.* ("CUIPA") and the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42–110a *et seq.* ("CUTPA") (Count Two). (ECF No. 23.) On November 11, 2016, USAA moved to dismiss the breach of contract claim under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the insurance policy at issue did not cover the alleged damage, and the CUIPA/CUTPA claim on the grounds that it could not be maintained in the absence of a breach of contract claim, or, in the alternative, that it failed to state a claim under CUIPA. (ECF No. 24.) The parties presented oral argument on August 24, 2017. For the reasons set forth below, USAA's motion is DENIED.

## I. Factual Allegations and Pertinent Policy Language

According to the allegations in the amended complaint, USAA has insured Plaintiffs' home in Tolland, Connecticut since Plaintiffs bought it in 2010. (ECF No. 23 ¶¶ 3-4.) Plaintiffs have always timely and satisfactorily paid their insurance premiums. (*Id.* ¶ 5.) Plaintiffs' insurance policy was automatically renewed each year. (*Id.*)

In April of 2016, Plaintiffs noticed that the basement walls of their home had "a series of horizontal and vertical cracks throughout." (*Id.* ¶ 6.) Upon investigation, they learned that a chemical compound in the concrete was oxidizing and expanding, "breaking the bonds of the concrete internally and reducing it to rubble." (*Id.* ¶¶ 7-9.) They also learned that the concrete was mostly likely supplied by the J.J. Mottes Concrete Company, which manufactured concrete for certain homes in the late 1980s and early 1990s. (*Id.* ¶¶ 8-9.) Plaintiffs' basement walls have begun to show signs of "structural[] fail[ure]": "bowing, bulging, jacking, shifting, and other instances of differential inward and upward motion." (*Id.* ¶¶ 13-14.) According to Plaintiffs, it is only a matter of time before the basement walls fall in due to pressure from the surrounding soil and the entire home falls into the basement. (*Id.* ¶¶ 11-12.) Plaintiffs expect the cost of repair to be at least $200,000. (*Id.* ¶ 28.)

On April 19, 2016, Plaintiffs notified USAA of the problem, and on June 1, 2016, USAA denied Plaintiffs' claim for coverage. (*Id.* ¶¶ 21-23.) In its denial letter, attached to the amended complaint and incorporated by reference, USAA stated, "Your claim for the cost to repair the cracking to the basement walls and floor caused by the defective concrete materials used in the construction of your home is not covered because your policy does not cover this type of loss." (ECF No. 23-2.) The letter continued, "[t]he specific policy language, which is the basis for the denial, is located on: Page 18, Section 1, LOSSES WE DO NOT COVER, LOSSES WE DO NOT

COVER UNDER DWELLING PROTECTION, OTHER STRUCTURES PROTECTION AND PERSONAL PROPERTY PROTECTION:, 2.c.(3)." (*Id.*)

In their amended complaint, Plaintiffs allege that the homeowner's policy issued by USAA covers "'collapse' of a building or any part of a building" when such collapse is caused by "(b) Decay that is hidden from view; . . . or (f) Use of defective materials or methods in construction, remodeling or renovation." (ECF No. 23 ¶ 24.) Plaintiffs attached to their amended complaint and incorporated by reference their most recent USAA Homeowners Policy, in effect from June 30, 2016 to June 30, 2017 (the "2016-2017 Policy"). (ECF No. 23-1.) In the Definitions section, as amended,[1] "collapse" is defined as, "a. A sudden falling or caving in; or b. A sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use." (*Id.* at 21, 57.)

The 2016-2017 Policy includes portions titled (1) "Section I - Property We Cover," (including "Dwelling Protection," "Other Structures Protection," "Personal Property Protection," and "Loss of Use Protection"); (2) "Additional Coverages"; (3) "Section I - Losses We Cover"; (4) "Section I - Losses We Do Not Cover"; and (5) "Section I - Conditions." (ECF No. 1 at 23, 27, 33, 35, and 38.) Under "Quick Reference," these are all listed under "Section I". (*Id*. at 19.)

"Additional Coverages" is a separately headed portion of the 2016-2017 Policy. (*Id*. at 27.) Under this portion, the 2016-2017 Policy specifies:

> 8. "Collapse". For an entire building or any part of a building covered by this insurance we insure for direct physical loss to covered property involving "collapse" of a building or any part of a building only when the "collapse" is

---

[1] As discussed further below, the 2016-2017 Policy contains an endorsement titled, "Amendment to Contract Provisions." (ECF No. 23-1 at 57.) The endorsement reads: "DEFINITIONS[:] 5. 'Collapse' is deleted and replaced by the following: 5. 'Collapse' means: a. A sudden falling or caving in; or b. A sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use." (*Id*.)

3

caused by one or more of the following:

>    a. "Named peril(s)" apply to covered buildings and personal property for loss insured by this additional coverage.
>
>    b. Decay that is hidden from view, meaning damage that is unknown prior to "collapse" or that does not result from a failure to reasonably maintain the property;
>
>    c. Insect or vermin damage that is hidden from view . . .
>    . . .
>    f. Use of defective material or methods in construction, remodeling or renovation if the "collapse" occurs during the course of the construction, remodeling or renovation.
>
>    Loss to an awning… foundation, retaining wall… or dock is not included under items b., c.., d., e. and f. unless the loss is a direct result of the "collapse" of a building.

(*Id.* at 30.)

Under, "Section I – Losses We Do Not Cover," the 2016-2017 Policy states, "Losses We Do Not Cover Under Dwelling Protection and Other Structures Protection." (*Id*. at 35.) Below this, the 2016-2017 Policy, as amended, provides:

>    1. Unless otherwise stated in 3. below we do not insure for damage consisting of or caused directly or indirectly by any of the following…
>        …
>        f. Wear and tear, marring, deterioration;
>
>        g. latent defect, inherent vice, or any quality of the property that causes it to damage or destroy itself;
>
>        h. Smog, rust, electrolysis or other corrosion;
>        …
>        k. Settling, cracking, shrinking, bulging or expansion of pavements, patios, foundations, walls, floors, roofs or ceilings;

(*Id.* at 35-36, 68.)

Also under, "Section I – Losses We Do Not Cover," the 2016-2017 Policy sets forth the subheading, "Losses We Do Not Cover Under Dwelling Protection, Other Structures Protection

4

and Personal Property Protection," which is the portion of the Policy cited by USAA in its denial letter. (*Id.* at 36; ECF No. 23-2 at 2.) Below this, the 2016-2017 Policy states:

1. We do not insure for damage consisting of or caused directly or indirectly by any of the following regardless of:

    (i)   The cause of the excluded event or damage that; or
    (ii)  Other causes of the loss that; or
    (iii) Whether the event or damage occurs, suddenly or gradually, involves isolated or widespread damage, or occurs as a result of any combination of these to; or
    (iv)  Whether other causes or events act concurrently or in any sequence with the excluded event to

produce the loss.
…
   j. "Collapse", other than as provided in ADDITIONAL COVERAGES, "Collapse".
…

2. We do not insure for loss caused by any of the following. However, any ensuing loss to property described in Dwelling Protection and Other Structures Protection not precluded by any other provision in this policy is covered.
   …
   c. Faulty, negligent, inadequate or defective:
      …
      (2) Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;
      (3) Materials used in repair, construction, renovation or remodeling; or maintenance.

      This limitation applies to loss or damage to any property on or off the "residence premises."

(*Id.* at 36-38.)

USAA attached to its motion to dismiss seven policies issued to insure Plaintiffs' home, one for each year dating from June 30, 2010 through June 30, 2017 (collectively, "the Policies"). (ECF No. 24-2). In the four policies dated through June 30, 2014 ("the 2010 – 2014 Policies"), the definition of "collapse" includes an additional sentence: "Damage consisting solely of settling, cracking, shrinking, bulging or expansion is not covered by this additional insurance unless it is

5

the direct result of 'collapse.'" (*Id.* at 211, 279, 344, and 388). The three most recent policies, dating from June 30, 2014 to June 30, 2017 ("the 2014-2017 Policies"), omit this language through an endorsement titled "Amendment to Contract Provisions." (*Id*. at 51, 114, 140).

In the 2014-2017 Policies, this endorsement also contains the following language explicitly applying the exclusions in "SECTION I – LOSSES WE DO NOT COVER" ("the Section I Exclusions") to the "Additional Coverages," where the collapse coverage is provided: "Unless specifically addressed elsewhere in this policy, the coverages provided below are the only coverages provided for the following. The SECTION I – LOSSES WE DO NOT COVER apply to these coverages [i.e., the "ADDITIONAL COVERAGES"] unless otherwise stated." (*Id*. at 52, 115, 141.) By contrast, in the 2010 – 2014 Policies, the section titled "Section I – Losses We Do Not Cover" does not explicitly apply to "Additional Coverages." (*See id*. at 139-140 (noting new amendments for the policy covering the June 30, 2014 – June 30, 2015 term).) As noted, subheadings under "Section I – Losses We Do Not Cover" refer to "Losses We Do Not Cover Under Dwelling Protection and Other Structures Protection" and "Losses We Do Not Cover Under Dwelling Protection, Other Structures Protection and Personal Property Protection." (*Id*. at 31, 33, 94, 96, 175, 177.) There is no mention of "Additional Coverages," itself a separately titled portion of the Policies, in the subheadings under "Section I – Losses We Do Not Cover."

The amended complaint also alleges that USAA participates in the Insurance Services Office, Inc. ("ISO"), an organization that collects data about insurance claims and drafts policy provisions. (ECF No. 23 ¶¶ 32-33.) Plaintiffs allege that, through participation in the ISO, USAA had knowledge of many claims in northeastern Connecticut resulting from similar concrete decay, the strategies other insurers had used to deny such claims, and cases such as *Bacewicz v. NGM Ins. Co.*, No. 3:08-CV-1530 (JCH), in which claimants were awarded judgment against an insurer for

concrete decay based on "nearly identical" policy language. (*Id.* ¶¶ 36-38.) Plaintiffs allege that in its denial letter USAA "gave the insured a knowingly false and misleading reason for the denial of coverage." (*Id.* ¶ 38.) Further, Plaintiffs allege that USAA is "regularly engaged" in refusing to resolve concrete decay claims in good faith, citing five similar cases in Connecticut Superior Court in which USAA is a defendant. (*Id.* ¶¶ 41-42.)

## II. Applicable Legal Standards

On a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), I take the plaintiffs' factual allegations in the complaint "to be true and [draw] all reasonable inferences in" their favor. *Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation and quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* A court need not accept legal conclusions as true and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

In deciding a Rule 12(b)(6) motion, I may consider documents attached to, integral to, or incorporated by reference in the complaint. *See* Fed. R. Civ. P. 10(c); *Chambers v. Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (internal quotations omitted). As discussed further below, for purposes of USAA's motion to dismiss, the parties acknowledge that any one or more of the Policies issued to the Plaintiffs, i.e., those for the seven policy terms from

7

June 30, 2010 through June 30, 2017, could apply to the loss Plaintiffs allege. As a result, I must decide whether Plaintiffs have stated plausible claims under any of the seven Policies.

"An insurance policy is to be interpreted by the same general rules that govern the construction of any written contract." *Connecticut Medical Ins. Co. v. Kulikowski,* 286 Conn. 1, 5 (2008) (citation and quotation marks omitted).

> If the terms of the policy are clear and unambiguous, then the language, from which the intention of the parties is to be deduced, must be accorded its natural and ordinary meaning . . . . When interpreting an insurance policy, we must look at the contract as a whole, consider all relevant portions together and, if possible, give operative effect to every provision in order to reach a reasonable overall result . . . . As with contracts generally, a provision in an insurance policy is ambiguous when it is reasonably susceptible to more than one reading. Under those circumstances, any ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy.

*Id.* at 5-6 (citations, quotation marks, and alterations omitted).

### III. Discussion

#### A. Breach of Contract (Count One)

##### i. Applicable Policies

Because the pertinent language of the Policies changed over the seven years since Plaintiffs began insuring their home with USAA, it is necessary to inquire as to which policy or policies apply to the loss alleged in the amended complaint. Plaintiffs do not explicitly allege which of the Policies govern(s) the alleged loss. They do allege, however, that their home was built in 1985, that they have insured their home "with a homeowner's insurance policy issued by the defendant at all times since they purchased the home" in 2010, and that, "[a]t some point between the date on which the basement walls were poured and April of 2016 the basement walls suffered a substantial impairment to their structural integrity." (ECF No. 23 ¶¶ 3, 4, and 20.) When reasonable inferences are drawn in the Plaintiffs' favor, these allegations suggest that the alleged

8

loss could have arisen under any one or more of the seven Policies, including the earlier policies in which the Section I Exclusions do not expressly apply to the coverage laid out in "Additional Coverages." Therefore, USAA must show that it is entitled to dismissal of the amended complaint under all of the Policies, including the earlier policies that do not expressly incorporate the Section I Exclusions into the "Additional Coverages" for collapse.

### ii. Coverage Exclusions

USAA claims that the damage to Plaintiffs' home falls within the Section I Exclusions (ECF No. 24-1 at 7-11.) Specifically, USAA argues that Plaintiffs' alleged damage of "pattern cracking" and "failure mechanisms" such as "bowing, bulging, jacking, shifting, and other instances of differential inward and upward motion" (ECF No. 23 ¶¶ 7, 13, and 14) are not covered, as they fall under the list of "Losses We Do Not Cover," which includes "[s]ettling, cracking, shrinking, bulging or expansion of . . . walls . . ." (ECF No. 24-1 at 8.)

It is not clear, however, that the Section I Exclusions apply to the collapse coverage sought by Plaintiffs. In the 2014-2017 Policies, they plainly do: the endorsement contained in the three most recent policies explicitly applies the Section I Exclusions to "Additional Coverages." (ECF No. 24-2 at 52, 115, 141.) But the 2010 – 2014 Policies contain no such endorsement. Without the amendment, the subheading under "Losses We Do Not Cover" reads, "LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION AND OTHER STRUCTURES PROTECTION." (*See, e.g., id*. at 225.) One reasonable reading of the 2010 – 2014 Policies is that the Section I Exclusions apply to coverage provisions contained in "Dwelling Protection" and "Other Structures Protection," not to the separately titled "Additional Coverages."

This reading finds support in the structure of the 2010 – 2014 Policies. As noted, alongside the sections, "Section I – Property We Cover," "Section I – Losses We Cover," "Section I – Losses

9

We Do Not Cover," and "Section I – Conditions," the separately titled "Additional Coverages" appears to stand on its own. (ECF No. 23-1 at 27.) Nothing in this portion of the Policies suggests that it is subject to any modifications of coverage found under other sections. Its substantive content also does not suggest it is related to other sections: "Additional Coverages" contains specialized coverages not inherently connected to protection of "dwellings," "other structures," or even "personal property," such as coverage for "Trees, Shrubs, Plants" and "Credit Card and Identity Fraud." (*Id*. at 28-29.)

Further support for this interpretation comes from the relative timing of the endorsement explicitly applying the Section I Exclusions to the Additional Coverages and a key change to the "Collapse" definition. In each of the 2010-2014 Policies, the "Collapse" definition includes the following, final sentence: "Damage consisting solely of settling, cracking, shrinking, bulging or expansion is not covered by this additional insurance unless it is the direct result of 'collapse'". (ECF No. 24-2 at 211, 279, 344, and 388.) That sentence was dropped, however, beginning in the 2014-2015 policy year, the same year that the "Additional Coverages" were explicitly amended to incorporate the Section I Exclusions, one of which excludes coverage for "settling, cracking, shrinking, bulging of . . . walls . . . ." (ECF No. 24-2 at 140, 141; *see id.* at 139-40 (noting addition of "Amendment to Contract Provisions" for June 30, 2014 – June 30, 2015 policy term).) This suggests that USAA decided to remove the restrictive sentence from the "Collapse" definition only because it was adding a similarly worded restriction through the endorsement that made the Section I Exclusions applicable to the "Additional Coverages."

At oral argument, defense counsel asserted that if the Section I Exclusions in the 2010 – 2014 Policies did not modify the "Additional Coverages," USAA would not have listed under "SECTION I – LOSSES WE DO NOT COVER" the provision at subsection j., which excludes

coverage for "'Collapse,' other than as provided in ADDITIONAL COVERAGES, 'Collapse'." (ECF No. 23-1 at 38.) And, as noted above, the "Additional Coverages" are listed under "Section I" in the "Quick Reference" section at the beginning of the Policies. (*See e.g.*, ECF No. 24-2 at 210.) All this suggests that a construction of the 2010 – 2014 Policies that applied the Section I Exclusions to the "Additional Coverages" would also be reasonable, but it does not suggest that a construction treating the "Additional Coverages" as an independent part of the Policies unaffected by the Section I Exclusions is unreasonable. As shown, there is considerable textual evidence to support that construction. And so, at least at the motion to dismiss stage, USAA's argument succeeds only in making the 2010 – 2014 Policies ambiguous. Interpreting the ambiguity in favor of the insured, as I must, *Connecticut Medical Ins. Co.*, 286 Conn. at 6 ("[A]ny ambiguity in the terms of an insurance policy must be construed in favor of the insured because the insurance company drafted the policy . . . ."), I will not apply the Section I Exclusions at the motion to dismiss stage with respect to the 2010 – 2014 Policies. And, as discussed below, because I conclude Plaintiffs have alleged a plausible claim for coverage under the 2010 – 2014 Policies, I need not decide whether they have done so under the 2014 – 2017 Policies.

### iii. "Collapse" Definition

USAA argues that even if Plaintiffs' alleged loss does not fall under the Section I Exclusions, it does not constitute a "collapse" and thus does not trigger collapse coverage. The 2010 – 2014 Policies define "collapse" as "[a] sudden falling or caving in" or "[a] sudden breaking apart or deformation such that the building or part of a building is in imminent peril of failing or caving in and is not fit for its intended use." (ECF No. 24-2 at 211, 279, 344, and 388.) As noted, the definition includes the additional sentence stating that "[d]amage consisting *solely* of settling, cracking, shrinking, bulging or expansion is not covered unless it is the direct result of 'collapse.'"

11

(ECF No. 24-2 at 211, 279, 344, 388.) I disagree with USAA because I find key parts of the definition of "collapse" to be ambiguous and, when construed in Plaintiffs' favor, to cover the damage described in the amended complaint.

Plaintiffs argue that they have alleged a "sudden . . . caving in," as contemplated by the definition of "collapse," and that the "sudden caving in" was caused by either "[d]ecay that is hidden from view" or "[u]se of defective material . . . in construction" (ECF No. 25 at 3) and thus falls under the Policies' coverage for collapse. More specifically, Plaintiffs argue that "sudden" means "unexpected" and "caving in" means "yielding to pressure," and that the damage described in the amended complaint is the result of such an unexpected yielding to the pressure of the surrounding soil. (ECF No. 25 at 8, 12-13.) I find that, in this context, "sudden" is an ambiguous term that could mean either temporally abrupt (as USAA argues) or unexpected (as Plaintiffs argue). In the context of an insurance policy involving "sudden and accidental" pollution, the Connecticut Supreme Court held that "sudden" "included a temporal quality, which requires that the onset of the release in question occurs quickly or happens abruptly." *Buell Indus., Inc. v. Greater New York Mut. Ins. Co.*, 259 Conn. 527, 536 (2002). The Court, reviewing dictionary definitions, "acknowledge[d] that, the word sudden can be used to describe the *unexpected nature*, as well as *abrupt onset*, of the event being described." *Id.* at 540 (emphasis added). But it concluded that in the context of the phrase "sudden and accidental," because "accidental" already included an element of unexpectedness, "sudden" had to be accorded a temporal element to avoid rendering it mere surplussage. *Id.* at 540-41.

Here, the Policies use only the adjective "sudden" to describe collapses, without "accidental" or any other qualifier. (*See, e.g.*, ECF No. 24-2 at 211.) The logic of the Court in *Buell*

thus suggests that the term "sudden" in this context is ambiguous: it could mean either unexpected, or temporally abrupt, or both.

The standalone "sudden"-ness requirement in the policies at issue here is distinct from similar concrete decay cases in which this Court and the Connecticut Superior Court have ruled for insurance companies. *See, e.g.*, *Metsack v. Liberty Mut. Fire Ins. Co.*, No. 3:14-CV-01150 (VLB), 2017 WL 706599, at *7 (D. Conn. 2017) (granting motion for summary judgment where policy required "a sudden *and accidental* direct physical loss.") (emphasis added); *Alexander v. General Ins. Co. of America*, No. 3:16-cv-59 (SRU), transcript of oral ruling, ECF No. 22 at 23 (D. Conn. July 7, 2016) (granting motion to dismiss where policy at issue defined collapse as an "*abrupt* falling down or caving in.") (emphasis added); *Jemiola v. Hartford Cas. Ins. Co.*, No. CV-15-6008837-S, 2017 WL 1258778, at *1 (Conn. Super. Ct. 2017) (unpublished) (granting summary judgment where policy defined collapse as "an *abrupt* falling down or caving in"); *Toomey v. Central Mut. Ins. Co.*, No. CV-15-6009841-S (Conn. Super. Ct. Jud. Dist. of Tolland Aug. 3, 2017) (unpublished) (granting summary judgment where policy defined collapse as "an *abrupt* falling down or caving in").

Furthermore, USAA uses the phrase "sudden and accidental" elsewhere in the Policies and goes so far as to define that term—suggesting both that, by itself, the term "sudden" does not have the exclusive meaning accorded to it in *Buell* (which also involved "sudden and accidental") and that there is a need for greater clarity when the word is used alone. Under "Definitions," the Policies define "sudden and accidental," as used elsewhere in the Policies, as "an abrupt, fortuitous event which is unintended from the perspective of a reasonable person." (*See, e.g.*, ECF No. 24-2 at 213). All of this is textual evidence that the term "sudden" as used in the "collapse" definition is ambiguous.

13

Plaintiffs allege that in April of 2016, they "noticed that the basement walls of their home had a series of horizontal and vertical cracks throughout." (ECF No. 23 ¶ 6.) Plaintiffs also alleged that "[c]oncrete made with good and sufficient materials is not designed or expected to fracture and expand" or "display failure mechanisms" of the type observed in Plaintiffs' home. (*Id.* ¶ 16-17.) Drawing all reasonable inferences in favor of Plaintiffs, I find that they have sufficiently alleged that the collapse of their home was unexpected.

To be sure, under the 2010 – 2014 Policies, "[d]amage consisting *solely* of settling, cracking, shrinking, bulging or expansion is not covered unless it is the direct result of 'collapse.'" (ECF No. 24-2 at 211, 279, 344, 388.) (emphasis added). But as Plaintiffs point out, the word "solely" significantly limits the effect of this language. Plaintiffs have alleged not only "cracking," "bulging," and "expansion," but also "bowing," "jacking," "shifting," and "other instances of differential inward and upward motion." (ECF No. 23 ¶ 13.) These alleged types of damage are not unambiguously outside the scope of coverage provided by the Policies.[2]

---

[2] It is true that Plaintiffs' allegations suggest that the "failure mechanisms such as bowing, bulging, jacking, shifting, and other instances of differential inward and upward motion" (ECF No. 23 ¶ 13) have been gradually occurring since the 1980s when the home was built, and that treating such gradually occurring decay as a "caving in" appears at odds with the pairing of "caving in" and "imminent peril" in the second clause of the "collapse definition." (ECF No. 23-1 at 21 ("b. A sudden breaking apart or deformation such that the building or part of a building is in imminent peril of falling or caving in and is not fit for its intended use.").) *See* The American Heritage Dictionary of the English Language (5th ed. 2017) (defining "imminent": "About to occur; impending"). However, when reasonable inferences are drawn in favor of Plaintiffs, Plaintiffs plausibly allege that their home experienced gradual decay and that, at some point, some small part of it unexpectedly "caved in," or "yielded to pressure"—an event that could have occurred in a short time. This is not incompatible with the notion that a "caving in" may be in "imminent peril" of occurring.

### B. CUIPA and CUTPA (Count Two)

USAA also moves to dismiss the CUIPA/CUTPA claim, arguing that USAA had a good faith basis for denying coverage. "A plaintiff may assert a private cause of action based on a substantive violation of CUIPA through CUTPA's enforcement provision." *Karas v. Liberty Ins. Corp.*, 33 F. Supp. 3d 110, 117 (D. Conn. 2014). The CUIPA provision relevant to this case is the prohibition of "[u]nfair claim settlement practices," in particular, "not attempting in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear." Conn. Gen. Stat. § 38a-816(6)(F).

Here, Plaintiffs allege that USAA "gave the insured a knowingly false and misleading reason for the denial of coverage," by citing an inapplicable loss exclusion in its denial letter. (ECF No. 23 ¶ 38.) They allege that USAA is "regularly . . . engaged" in refusing to resolve such concrete decay claims in good faith, citing, for example, five similar cases in Connecticut Superior Court in which USAA is a defendant. (*Id.* ¶¶ 41-42.) Plaintiffs also allege that, through participation in the ISO, USAA had knowledge of many other concrete decay claims in northeastern Connecticut and the strategies used by insurers to deny those claims. (*Id.* ¶¶ 36-38.) According to the amended complaint, USAA was part of "an insurance industry wide practice of denying coverage for concrete decay claims." (*Id.* ¶ 39.) Plaintiffs allege that USAA's unfair and deceptive trade practices caused them loss and damages. (*Id.* ¶ 45.)

Other courts have found similar allegations sufficient to sustain a CUIPA/CUTPA claim, concluding that where the insurer gave a knowingly false reason for denying coverage, it had failed to act in "good faith" under CUIPA. *See, e.g.*, *Gabriel v. Liberty Mut. Fire Ins. Co.*, No. 3:14-cv-01435-VAB, 2015 WL 5684063, at *5 (D. Conn. Sept. 28, 2015) ("The Gabriels allege that Liberty Mutual gave them a false and misleading reason for denying coverage by citing inapplicable policy

15

language, and failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of their claim . . . . These allegations satisfy the requirements to allege that the defendant engaged in an act prohibited by CUIPA."); *Karas*, 33 F. Supp. 3d at 117 ("The Karases allege that Liberty Mutual gave them a knowingly false and misleading reason for the denial of coverage, and thus failed to attempt 'in good faith to effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear,' which is proscribed by CUIPA . . . . Therefore, the complaint states a plausible claim for violation of CUTPA.").

USAA argues that "[w]here USAA's coverage was, at a minimum, fairly debatable, there can be no violation of Conn. Gen. Stat. § 38a-816(6)(F)." (ECF No. 24-1 at 19). But the only basis for denial cited by USAA in its denial letter—"Page 18, Section 1, LOSSES WE DO NOT COVER, LOSSES WE DO NOT COVER UNDER DWELLING PROTECTION, OTHER STRUCTURES PROTECTION AND PERSONAL PROPERTY PROTECTION:, 2.c.(3)," refers to the exclusion for coverage for "[m]aterials used in repair, construction, renovation or remodeling; or maintenance." Drawing all reasonable inferences in favor of Plaintiffs, and given that under one reasonable interpretation, the cited exclusion was inapplicable to the coverage sought by Plaintiffs, I cannot conclude on the basis of the pleadings and the incorporated Policies that Plaintiffs' CUIPA/CUTPA claim fails. Plaintiffs have plausibly alleged that it was not in "good faith" to cite an inapplicable exclusion, particularly in light of USAA's alleged knowledge of similar cases through its participation in the ISO. Plaintiffs also have sufficiently alleged a "regular business practice," to sustain the CUIPA/CUTPA claim, by citing several other cases involving USAA and its participation in the ISO. *See, e.g.*, *Liston-Smith v. Csaa Fire & Cas. Ins. Co.*, No. 3:16-CV-00510 (JCH), 2016 WL 6246300, at *3-4 (D. Conn. Oct. 25, 2016) (denying a

motion to dismiss a CUIPA/CUTPA claim where the defendant was listed as a defendant in several other cases related to denial of coverage for damage resulting from concrete deterioration).

## IV. Conclusion

For the reasons stated above, USAA's Motion to Dismiss is DENIED.

IT IS SO ORDERED.

/s/
Michael P. Shea, U.S.D.J.

Dated:      Hartford, Connecticut
              August 29, 2017